May I proceed? Thank you. May it please the Court, Wendy Overmeyer for Edward Knight, and I'll reserve five minutes for rebuttal, and I'll track my time. Thank you. The principles here at issue today are not new, and those are the basic constitutional thresholds for public jury trials and due process fair trial rights. And today I'd like to address two main points. First, why Knight's challenge to the virtual juror is not waived. And second, why the case meets even plain error review, should this Court determine that plain error applies. Is the deputy federal defender who handled things at trial been fired? Because by your argument, he either totally missed an obvious constitutional issue or totally misled Judge Due to allow the client to waive something he knew was not waivable. Here, it was the district court that suggested the virtual juror as one of three options. Right, and the prosecutor objected, and the defender said, yeah, let's go your way, Judge, and my guy totally understands it, and he's willing to waive it, and he has no doubts and no questions, so let's go your way. And what's important for waiver, I agree that's what defense counsel put forward below, and what's important for waiver is not what counsel understood, it's what Mr. Knight understood. And so for that, we look at the context of the colloquies. So at the beginning of the day and then at the end of the first day of the virtual juror, and there were three understandings here that show why it wasn't waived by Knight. And he was told by the court he could object to the juror being virtual, and the juror could be there in person, and then he also understood that to object meant the trial would be delayed. That was something, again, that defense counsel said both at the first and second colloquies was we don't want to delay this trial, so we're not objecting. Of course, there was a third option to have an alternate juror, but that wasn't discussed. It was discussed initially, but was never discussed again, particularly at the second colloquy. And what's very important at the second colloquy is that Knight understood if he consented, he could appeal the virtual juror process because it's the appellate waiver discussion that was before the second colloquy that really is critical here to why this issue was not waived. So the government had asked that the court recanvass the defendant and make sure that the defendant understood he was waiving, quote, any right to challenge the virtual process. And at that point, defense counsel objected and said, no, we don't think there has to be an appellate waiver. But the judge specifically told your client if he wants the juror out, the juror's out, right? That's correct. I want to make sure you understand that you have the option of electing not to proceed with this virtual juror. If you object, I will not proceed with that option. Do you understand that? Yes. And after having been told what his options were, you decided you don't think that's enough? I don't think that's enough, particularly because, well, first, the Dupuy case says knowing that you can object alone may not be sufficient for waiver. So I think that's a close line, if that was enough. And then if you add on this discussion of appellate waiver, so the court— So would your client have basically had to say to the judge or his lawyer, you know, We think juror number 10 is the best person in the veneer. Please don't get rid of juror number 10 because we really want him on the jury. Would that have been enough to show a waiver? That would have shown defense counsel's strategy on the record, which here we don't have a strategy on the record. But I think what we need to look at is what Knight was asked and what Knight understood. Well, it's pretty clear. I mean, if your client had not been directly addressed by the court, that would be one thing. But the court did ask him, and at the end, the court says, I find Mr. Knight understands that he has the right to insist that juror number 10 participate in the trial in person, and he's waived that right and consents to have the juror view the trial via Zoom for now. And if he didn't understand, you know, there's that finding, it made an open court. And if your client said, that's not what I meant, or his attorney, it could have said so. And we're doing—during the pandemic, we're doing lots of remote criminal matters. And, you know, the idea that any time we do this, we have to go through something more than what Judge Duwe went through is just — I don't understand that. I mean, when I look at this case, I ask myself, why is this charged in Federal court? Why is it not just a robbery in State court, like all the other robberies go into State court? And, you know, why are they exercising the Hobbs Act to — in this manner? Is it a discriminatory — that's what I just dealt with in Seattle. We had a bunch of robberies around a George Floyd demonstration in Bellevue, but they selected only two young black men to go to Federal court. And I was like, what's going on here? And there was a motion to dismiss. I don't see that anywhere here. And then you have the jury issue. So why get distracted by this other one, which has eaten up your time like crazy? Why don't you get to the jury selection issue, and let's take it from there. Okay. If I can speak briefly to the jury wheel issue, that's what we're discussing. And so the jury wheel, we believe we've met our burden for the Sixth Amendment and the J.S.S.A., where we — it's the defendant's burden to initially make the — showing that a distinctive group was excluded. And here, the distinctive groups were black individuals, American Indian and Native individuals, and Hispanic individuals. Just talk about African American. Okay. And the disproportionate representation of those groups was due to systematic exclusion. And how that's shown, it doesn't require intent. What that means is the disparity is unlikely due solely to chance. Okay. Let's say you win on the first one and you win on the third one. What about — how do we get to — are we using standard deviation? Are we using, you know, different comparative statistical guidance here? Ninth Circuit law was over here, thanks to Judge Thomas and his en banc. It's moved a little bit, but it's not quite to where you are. What was used here was a blend of two different statistical methods. And what we ended up with was our unrebutted expert saying that the underrepresentation was not the result of random factors, chance, or luck. And that's at 7 ER 1495. And so that is enough to make a initial case under the Hernandez-Estrada standard. And that the district court erred in finding that wasn't enough. And at that point, it should have shifted to the government to meet its burden, to show that these deficient aspects of the jury wheel must advance. Yeah. So just so I'm clear as to your position on this, this would be true with regard to every criminal case in Reno, right? Where an objection was made. Every single criminal defendant who raised the argument that you are raising about the underrepresentation — and to go with Judge Lasnik, we'll focus for the minute on African-American — that in every one of those cases, they would meet their burden where they're using the two-year wheel and your expert's testimony is still temporally relevant, and the burden would shift to the government for every case in the Reno district. Certainly where there were motions made. Yes. I understand there would have to be a motion, but your answer is essentially yes. Yes, because it is the jury wheel for all of the cases. It's renewed only every two years, which is, again, part of, we think, part of the problem, if that was refreshed more often. What do you think the problem is? Besides the jury wheel refreshed? The only thing I've seen in the record, but you can correct me if I'm wrong, is that you think they should be drawing the jury wheel every year instead of every two years. Anything else? Yes. And there's inconsistency as to which counties include inactive and active voters, and there seems to be no particular reason for that, that some use only active voters. But unless I'm misinterpreting the record, your expert did not opine on those factors. Again, what our expert helped do was get to the initial burden. Right. And did the expert ever say it is statistically significant? What I see is the expert saying it's not the product of random chance, but usually when statisticians testify, they testify in terms of statistical significance. And I didn't see that in the expert's testimonies. Am I misreading it? I would have to double-check these, I mean, the three experts' opinions. The three standard deviations is, you know, I think important, but I'm not sure it's enough to get you where you need to go. I mean, the whole point of the Ambon case is to say, look, you aren't confined to the absolute disparity test because that's statistically suspect and there are other methods of proving this. So it opened the door for proof, but in looking through here, I say, okay, what's wrong? If this is true, what's wrong with the way Nevada does things? And I'm not sure that I have an answer for that in the record. I think the proceedings didn't get that far because there wasn't a hearing, it was just shut down by the district court saying that the defense hadn't met that initial burden, which we have met that initial burden. As the court notes, the 3% deviation has been enough for several courts. I believe it was Castaneda, the Supreme Court in 77, found that that was enough. Your initial burden also has to be not just on prong one and prong three, it has to be that the representations in the veneer is not fair and reasonable in relation to the number of people in the community. And standard deviations doesn't equal not fair and reasonable, right? Those are different parts of the three-part test, aren't they? Well, the disproportionate representation here, again, I'm not sure I completely can answer the court's question about the kind of fine detail of the statistical methods here, which was why a hearing, at least, would be helpful if this court would remand back because we didn't get a hearing below. When we did make enough of a showing to at least get a hearing, if the court had further questions between the two experts about, you know, various statistical methods. Well, whether Judge Du gave you a hearing or not, you had the ability to put together a record for this court to look at, and it just doesn't seem to have been made. And maybe we, again, it was the distraction of the remote juror issue or some of the other evidentiary issues, but this is a big, significant step you're asking this court to make, to invalidate potentially every conviction in the Reno division, and we're not going to do that unless every I is dotted and every T is crossed. And this is an ongoing concern of our office as well, and it continues to be developed in our Reno cases. And I see I'm almost up to time, but I did want to answer one question that the court had about that we've been using Zoom in criminal processes. While we have been using Zoom, it has not been for criminal felony jury trials. That has never happened. The state's trials that were going on during the pandemic, if this had been a state case, he would have had a jury in person. No one has done this remote juror process, and that kind of... Aren't you very close to an invited error here? I mean, the defense counsel says, we want the juror by Zoom. Your client said, we want the juror to appear by Zoom. And now you're saying, okay, sorry, Judge, we misled you on that. It's structural error, and we wanted to keep this whole card for appeal. I mean, that's when you look through that and we see, well, Judge Du really did proceed pretty carefully. So isn't this a case of invited error? It's not invited error because it was the district court's initial suggestion, and also because, again, Knight's waiver wasn't completely knowing. If I can go back on 1 ER 78, the court says, well, there are many circumstances here he could still appeal. I'm not going to make him waive these appellate rights. And that's the challenge enlisted, the challenge whether the waiver's knowing. He could challenge that it's a right that cannot be waived. Defense counsel agreed. And so Knight agreed to the juror understanding that he had the ability to raise certain challenges on appeal. And here, like in Olano 2 that the government put in as 28J, it was a novel tinkering with the jury that meets at least the initial two prongs of plain error. And here in Knight's case, it also shows prejudice because it was two full days of proceedings with the inherent limitations of the remote process that we discussed in our brief. And that was critical testimony. It was the bulk of the government's case. And if the court had gone along with the prosecutor and said, no, I understand the defendant really wants this juror, but I don't think we can do this, and so struck the juror, would there have been an appeal on that from the defendant? Seeing as though there was no precedent for allowing this unique process of a remote juror in violation of public trial rights, it's unlikely that that would have been a challengeable ruling. But counsel, you talk about the problems with remote. Everyone who has looked at this issue says jurors are happier in remote than they are driving hours to the courthouse. They get a better view of the witnesses. They're able to look at exhibits. I haven't seen anything that lends itself to there's a diminishing of rights or ability to understand by a juror. I think what's instructive is this Court's case in Carter, 2018, which we have in our witnesses, and how that was not the constitutional equivalent of appearing in person because of the inherent limitations of remote process, and then also just the qualities of appearing in person for truth assessments. And again, I'm not aware of any criminal case that this has been approved of or even happened, this violation of public trial. And I see I'm passing it to you. We'll give you a reserve. May it please the Court, Bill Reed for the United States. The question in this appeal is whether a defendant who zealously advocates for a remote juror arrangement over the government's strenuous objections, where he knowingly, voluntarily, and intelligently relinquishes the right to have the juror present in the courtroom, then can he change his position on appeal after he's been convicted and seek reversal? I think the question is, is it structural error or not, right? I mean, if it's structural error, then probably yes. If it's not structural error, then no. Yes, Your Honor. Tell me what the government's view is on that. This is not one of the rare instances defined by this Court and the Supreme Court of structural error. There are a finite number of structural error categories. This is not one. And the Alano case, Alano 2, which is in the government's 28J letter, comes as close, I would suggest, as this Court may have previously addressed, as to whether or not this constitutes structural error where a sleeping juror, I'm sorry, a juror who was away from the courtroom altogether during a trial for a half a day and did not, as in this case, get to go to participate in the trial, although through a remote video teleconference process, this Court found that that was not plain or structural error. Counsel, let me give you a hypothetical that is different than what we face here. Let's say that the positions of the parties in front of the district court were reversed, where the government wanted the juror to be able for a very short time to participate remotely, the defendant objected on constitutional grounds, and the district court ruled in favor of the government. Is the United States' position that in that circumstance that that would be a violation of the defendant's constitutional right, or is the United States' position not necessarily? The latter, Your Honor. Not necessarily, because, again, I would rely on the Alano case. Of course, in the Alano case, I think both parties did agree to it, but again, this Court found that that was not the type of, it was not plain or structural error, so I don't think it would be, I don't think it would constitute, if the government had objected, had not objected, and had advocated for it, I don't think that we would have error. But the Court doesn't have to decide that arguably more tricky question than what's simply before this Court, whether when all parties agree, well, not all parties, but where the defendant agrees, advocates, zealously advocates, and every objection that the government put forward, he diminishes, and the Court advised him, as this Court, as Your Honor previously noted, over and over again, that he had the absolute right to refuse to agree to participating, and that the... So, do you agree with the trial counsel, your trial counsel, that the jurors should not have appeared remotely? I think trial, I mean, the government, the government objected strenuously. Do you agree with the government's objection? I agree with the position that trial counsel took as a cautious position to try to avoid an issue that didn't necessarily have to blossom to where we are here today. There was an alternate juror. I think that was the path of least resistance that the AUSA was hoping to travel down, rather than this one. So, your view is it was reasoned caution? Absolutely, Your Honor. Conservative approach to an issue, but here we are, and I'm not criticizing trial counsel. No, I'm just, I mean, the government took a pretty firm position before the trial judge that this juror shouldn't participate, and now you're arguing, well, that's all right. It was okay. I mean, it's just there's a little bit of an anomaly here on both sides, yeah. I'll concede that, Your Honor. It is ironic, but things were developing rapidly at trial. This came up the second day, and here, in hindsight, the government's had an attempt to develop the case law, the Alano case, and it seemed more practical at the time to rely upon one of two alternate jurors. Well, Alano is a plain error case, you'd agree, right? It is. I do believe the court said, though, that it was not plain or structural error, though. I believe it's structural error. I'd have to look at the case closer. I believe there was an argument of structural error made in Alano. I could be mistaken on that, but I believe that there's verbiage from this court that this was not plain or structural error in that case. And, Mr. Reed, go ahead. No, no. In regard to the jury pool and the fairness situation, the government didn't call its own expert. The government didn't extensively, you know, put on evidence that, you know, everything is kosher here. The numbers are a little disturbing, aren't they, about exclusion of African Americans? Your Honor, the numbers are, I would submit, first of all, I do believe the government, I may be mistaken. I do believe there was an expert report submitted by the government that the district court did consider. I may be mistaken on that. But to answer, the numbers are not out of line with what this and other courts have reviewed in any number of the statistical variations of the variety of statistics that this court has said can be considered. They're not, they don't starkly or radically depart from that composite. How would you define starkly to deviate? I mean, just looking at it statistically, what you think is important and what's not. I think over time is what the case law says here. We're looking at a snapshot of a two-year jury wheel. I think that if the defendant had presented, can present something over time. I don't even, I wouldn't concede that the numbers here are any different from what this and other courts have reviewed or have found to pass muster in the past. But we don't have that one snapshot view of the two-year jury wheel. Why is that a snapshot? I mean, isn't that just a realistic view of what has happened in the two-year period? And the question is if it's, you know, either it's significant statistically or there's enough for a concern, is there an explanation for why the disparity occurs? I mean, I don't understand why you would say let's go over a ten-year period, let's go over a five-year period. I mean, why, what case says that? I believe the Castaneda case, Your Honor, is one that's where it's over a significant period of time. Why isn't two years significant? I mean, that's, I don't understand statistically where you're going with this. I mean, I just don't. I mean, I think the two years, if you have a snapshot in two years get you through the door statistically, then that's the government's burden to come back and say, well, no, it's not unfair and here's why. And it's a lot, we can't do this every year mechanically. And if you did, it wouldn't change the jury pool much. They're arguing they got through the door and the district court was required to have a hearing. I think the court reviewed the statistics here and then went to the third prong of both the Fifth Amendment and the Sixth Amendment, the two tests which require both discriminatory intent and systematic exclusion and found that even if these numbers rise to some level of significance, that the defendant did not meet that part of the burden in this case. I think that's what the court found. And in this case, I do think the two-year jury wheel has some significance. And the plan, I might note that the jury selection plan is one, I'm sorry, Your Honor, No, go ahead. This court actually reviewed the district's jury selection plan and it was submitted and I do think that that has some relevance in consideration of whether or not there was discriminatory intent or systematic exclusion. No discriminatory intent, but systematic exclusion by virtue of selecting a two-year rather than a one-year process of updating the potential pool because African-Americans were more likely to move in than other groups. They were not being counted. That is systematic. It doesn't require discriminatory intent to violate our case law or the U.S. Supreme case law. Certainly, I think the defendant's expert gave some, tended some information that there were moving patterns by African-Americans. But I don't think that when the court reviewed that in context with what was presented, that it was enough to carry the defendant's burden that at that stage that there was discriminatory or systematic exclusion in this case. I don't think that the court, I think the court correctly found that that was what was at stake. Any further questions? Well, he's got some more time. I just want to ask you the, you know, I brought up with the defender, why did the government go federal on this? Was it part of that, you know, sort of the administrations, we have to get tough on people who are out demonstrating and doing stuff? Do you normally just prosecute regular robbery cases? This was not a big-time robbery case in federal court. I would have to go a little bit outside the record to answer that. If I may be permitted, I just, Your Honor, I'm in the District of Nevada. I can't speak to any policies. I'm a small person, but I do think that they do look at certainly criminal histories and things of that nature. Just in general, I can't speak to this case. I was not the line assistant. Sure. But, yeah. No, I just, like I said, I brought it up in my case where there were two individuals and they moved to dismiss for selective prosecution and violation. And I, you know, we have a new African-American U.S. attorney in the Western District. I said, would you please, Mr. Brown, take a look at this case and tell me if you really want to proceed. And he agreed to dismiss the charges and they were filed in state court. You know, sometimes a prosecutor has to do the right thing and the just thing. Yes, sir. Always. All right. And if we're going to do it always, don't we need to account? I mean, for years, women were being excluded from juries, right? In large numbers. And courts were saying it's okay to have 15% women, even though women are 53% of the population. Until the U.S. Supreme Court, after hearing argument from Ruth Bader Ginsburg as a lawyer, said, no, this is not okay. And are we at the point where we can exclude 40% of the African-American population from being in that potential jury pool and say it's okay? And still be seeking justice? In general, to try to be responsive to Your Honor's question, I think that the Supreme Court has said that, in the law, that the jury pool does not have to be an exact replica of the community and there can be deviations as long as the system in place is fair and representative. And I would submit that here there's just nothing in the record to support that the system in place here contributed to that is the best I can answer, Your Honor. Okay. Thank you. Unless there are any further questions about this or any other, I'll respectfully submit it to the panel. Thank you. Thank you, Counsel. We are rebuttaled. Thank you, Your Honors. If I could address the concerns of the court for discriminatory prosecution and the jury wheel issue as well, underrepresenting African-Americans. This really highlights two areas where defense attorneys work in the dark. We are not privy to why a certain case goes federal versus states. In this case, there was less than $1,000 stolen. Nobody was injured. These are kind of basic Hobbs Act robberies. And of course, they tacked on the mandatory 924C time. And in addition with jury information, it's difficult for defense attorneys to get the information to make these claims. And while Judge Dude did provide discovery here, there was a lot of struggle with the particular court office to get the correct information in time, to meet deadlines, and so to prove kind of an over-historical time, as the government is saying the defense has to prove, well then the defense should be entitled to that discovery, to have that documentation to look over it. But here, the particular jury wheel here is what's important for Mr. Knight. And was that a fair cross-representation? And the numbers here with black jurors being 53% underrepresented on the grand jury, 41% underrepresented on the pettit jury, that meets our initial burden to show, and we don't have to show that there was actual intent, because there's rarely overt intent. If that were clear, this court wouldn't have approved the jury selection plan. So, what that shows... Usually in jury challenges like this, the argument is made, you shouldn't use voter registration lists, you shouldn't use vehicle registration lists, because those tend to over-represent or under-represent certain areas of the population. And from what I can tell from your theory, is basically because there's a lot of changes in population, that they have to do it every year. Which is novel to me. I just haven't heard that kind of a challenge before. Is that basically what your theory is? That was one suggestion. And again, we met our burden to have the government, to shift the burden to the government, and perhaps a hearing could have clarified these things. But there are certainly a lot of ways counties and states and federal systems do it, either through driver's license or state identification. Things such as that, that can be used to widen the pool base for a federal criminal jury in this area. And I see I'm about out of time, so we would ask the court to vacate Mr. Knight's convictions, and remand for further proceedings or a hearing on whether the government can meet its burden for the particular jury wheel in this case. Thank you, counsel. Thank you both for your arguments today, and for traveling here in person to argue in front of us. The case should be submitted for decision, and we'll be in recess for the morning.
judges: THOMAS, BENNETT, Lasnik